## J. C. & A. C. POWERS *v.* MARTIN LEACH, JR.

*Depositions.    Collateral testimony.    Depositions when equivocal
may be submitted to the jury, &c.*

It is not competent for one to introduce testimony to contradict a witness, upon a matter wholly collateral to the main issue, and the court may in their discretion reject such collateral testimony altogether; so too the court may in their discretion allow a departure from the general rule, as is sometimes done in important criminal cases. 12 Vt. 585.

And where the witness was contradicted in a matter collateral to the main issue, and the court after admitting the evidence, submitted it to the jury whether upon the whole, they believed the main fact testified to by the witness, *it was held* that there was no error.

When a deposition is equivocal, the better rule is, to admit the testimony, and leave the interpretation to the jury with proper instructions from the court, though it is competent for the court to put its own construction upon the evidence.

And where the witnesses in their depositions when testifying of the reputation of other witnesses for truth and veracity, used the terms, " character for truth, &c," and " general character for truth, &c.," *it was held*, that character, general character, report or reputation, when so used are the same, and that the depositions were properly admitted.

TRESPASS *quare clausum fregit,* for breaking and entering divers barns, and other buildings connected therewith, of the plaintiffs in Pittsford, and setting fire to and burning the same together with the contents.

Plea the general issue and trial by jury.

The plaintiffs with other evidence tending to prove the issue on their part, introduced the following deposition of one Charles A. Pine, of Constantine, in the county of St. Joseph, in the state of Michigan, who testified that " in the winter and spring after the " Powers commenced their prosecution against me and Mr. Leach, " in conversation, Leach said the Powers had commenced their " prosecution against us, and were abusing us, and that he did not " know any other way to stop their noise than by burning "their buildings ; that if we burnt their buildings, they would " mistrust that it was him, (Leach) and let him alone.    Leach "tried several times, to get me to burn the barns ; I refus- " ed to do so ; during this time I lived with Mr. Leach.    In the " spring of 1847, I left Mr. Leach, and went to live on the farm

Powers et al. *v.* Leach.

" of Patience Bresee; Leach was frequently there, and I was
" frequently at his house, in the course of the summer; in the
"course of our conversation he said, he thought he could get May-
" go, who then lived with him, to burn the barns. Leach had
" in the course of our conversation several times offered to give me
" fifty dollars, if I would burn the barns. Mr. Leach came to Mrs.
" Bresee's one Sunday, and told me he had got Maygo to burn
" the barns; that they would probably be burnt some time
" that week, that I had better stay evenings where I could show
" where I was; that as I had had difficulty with the Powers, it
" would very likely be laid to me. The next I heard of it was
" the next Sunday, when Mrs. Bresee came home from meeting,
" she told me the Powers' barns were burnt, that they were burnt
" the night before. On the same Sunday, I think, or the next
" Sunday, Leach came down to Mrs. Bresee's; I think I first al-
" luded to the burning of the barns; Leach then denied having
" any knowledge about it. After that, we went into the lot togeth-
" er, and Leach then told me the circumstances of burning the
" barns; that Maygo burnt them; that the same afternoon, he
" (Leach) went to the village and came home at night unwell;
" when he got home he found Maygo unwell, that they staid about
" some time, and that Maygo went to bed in the presence of the
" family; after he had been abed awhile, he (Leach) steeped some
" herb drink, and carried it up to Maygo; I think he also told me
" he carried up a gun at the same time, and left it in his (May-
" go's) room; that Maygo got out, I do not recollect that he told
" me the particulars how Maygo got out; that he (Leach) staid
" up about the house till Maygo returned, and he let him in, and
" soon after went to bed.

" *Cross Examination.*—I think Mr. Leach had several such con-
" versations with me before I removed to Mrs. Bresee's; not a
" great many but several; and I think he made me the offer of
" fifty dollars before I removed. After I removed he con-
" tinued these conversations till about two or three weeks be-
" fore the time he told me he had got Maygo to burn the
" barns. I was sometimes at Leach's, as often as once or
" twice a week, and at other times not oftener than once in two
" or three weeks, after my removal to Mrs. Bresee's. I think
" Leach came to Mrs. Bresee's after she came from meeting, four

" or five o'clock in the afternoon, I think the next day after the
" barns were burnt, though I cannot swear positively ; I do not
" recollect of any business he had there, that day, nor what brought
" him down there. I think I first saw Leach as he drove under
" the horse-shed, where I first conversed with him about the fire,
" and I think we went into the meadow before Leach went into
" the house. The horse-shed may be four or five rods from
" the house. I do not recollect that any one was about there
" when Leach drove up. I first disclosed these conversations to
" my two brothers at Burlington, two years ago this fall, accord-
" ing to my recollection. Questions were frequently asked me be-
" fore that time about the burning of the barns. I do not recol-
" lect particularly the answers I made. I might sometimes car-
" ry the idea one way, and sometimes another ; I might have inti-
" mated my belief in relation to the matter ; but do not know that I
" ever, before the time alluded to, intimated that I had any knowl-
" edge about the burning of the barns ; I cannot recollect when
" Leach told me he thought he could get Maygo to burn the
" barns ; it was sometime in the course of the summer ; it might
" have been as late as three or four weeks before the barns were
" burnt. I do not recollect how Leach came to mention this to
" me. I do not think I ever encouraged Leach in this thing ; but
" told him such things had better be let alone. I think I told him
" this in the outset. When he made me the offer of fifty dollars,
" I told him I should have nothing to do about it, and that I did
" not want to do anything about it. I came here two weeks ago
" to-morrow."

The counsel inquired of the witness what compensation the
plaintiffs gave him for coming here—to which the plaintiffs object-
ed—under objection the witness says; " the plaintiffs are to give
" me eighty dollars and pay my expenses, except the expense of my
" return, which I am to bear myself. None of the Powers ever
" attempted to hire me to testify against Mr. Leach, or to get me
" to testify that Leach got Maygo to burn the barns. I never
" said anything of that kind to William Beals. I have never had
" any difficulty with Mr. Leach, and I know of no difficulty be-
" tween us the last time I was at his house, a year ago the sum-
" mer past, and I know of none since. I never used threats
" against Mr. Leach. When told by Mr. Leach that he had got

" Maygo to burn the barns, I did not notify the Powers, because " I did not wish it to be known that I had any knowledge about it, " and because I did not wish to do anything about it. It is about " 950 miles, from my place of residence to Rutland."

There was no evidence of the fact of the admissions made by the defendant to said Pine, except the said deposition.

The defendant introduced testimony tending to prove that the said Leach did not go to the Mrs. Bresee's named in the said deposition, and was not seen there by the said Pine upon any of the Sundays named by the deponent in his deposition. The defendant thereupon requested the court to instruct the jury, that if they should find from the evidence, that the defendant did not go to Mrs. Bresee's, and was not seen by said Pine there, upon either of the Sundays named in said deposition, they should lay aside, as not entitled to credit, the testimony of said Pine, as to the admissions of the defendant, made on those occasions respectively. The court declined so to charge the jury, but did charge that if they should find that the defendant did not go to Mrs. Bresee's on either of the Sundays named in the deposition, and was not seen there by Pine on either of said Sundays, that fact would tend to impeach and discredit Pine's testimony ; but the extent of credit which should be given to Pine's testimony as to the admissions made to him by the defendant, was a matter for the jury, and they might find such admissions proved, although they should find the fact of the defendant's absence at the time set by Pine, as claimed by the defendant, if they believed Pine was mistaken only as to the time and place, or they might reject his testimony entirely, as unworthy of any credit whatever.

The plaintiffs also introduced as a witness one William Maygo, who testified to material matters for the plaintiffs, and among other things, that he burnt the plaintiffs' barns by the direction of the defendant.

The defendant introduced evidence tending to prove that the general reputation of said Maygo and Pine, respectively, for truth and veracity was bad.

The plaintiffs, in order to sustain the character of said Maygo and Pine, in these respects, offered the following depositions :

*Andrew J. Palmer, of Constantine, county of St. Joseph, state of Michigan, deposed as follows :* " that I hold the office of

" Treasurer of the Township of Constantine aforesaid, and have " known Charles A. Pine, since he came from Vermont, in the fall " of 1849,—have resided within a half mile of him, and believe " that his general character for truth and veracity ·is good."

George Palmer, of Constantine aforesaid, deposed as follows : " that I hold the office of Township Clerk, in said Township of " Constantine, and have known Charles A. Pine, since he came " from Vermont, in the fall of the year 1849,—have resided with- " in a half mile of him, and believe that his general character for " truth and veracity is good."

Lyman B. Reynolds, of Williston, Vermont, deposed as follows : " that I have lived in the same neighborhood with Charles A. " Pine, late of said Williston, and until said Pine left Williston, " some two or three years ago, we were somewhat intimate from " our youth. I have never heard any report against the charac- " ter of said Pine, but always during our acquaintance, said Pine " has sustained a good moral character, and stands on a par with " other men for truth and veracity."

David A. Murray, of Williston aforesaid, deposed as follows : " that I have been acquainted with Charles A. Pine, from his " youth to within five or six years, and I consider him to be a " young man of good standing, and on a par for truth and ve- " racity."

John Conley, of Onondaga, New York, deposed as follows : " that I have known William Maygo for the last eighteen months, " and that his character for truth and veracity, is as good as men's " in general as far as I know."

George N. Wakefield, of Williston aforesaid, deposed as fol- lows : " that I have lived in the same neighborhood with Charles " A. Pine, late of said Williston, for many years previous to his " leaving Williston a few years ago, and during all my acquaint- " ance with him, I have never heard any evil report of him, but " believe he has sustained a good moral character, and was on a " par with other men for truth and veracity." (This deposition was not objected to, till after it was read to the jury.)

The foregoing depositions, with the exception of the last, were objected to as immaterial and impertinent in substance, but they were admitted by the court, and read to the jury, except the court excluded all that part of the deposition of the said Reynolds, af-

Powers et al. *v.* Leach.

ter the word "*youth*," except the words, "*said Pine stands on a par with other men, for truth and veracity.*"

The deposition of the said Wakefield, was, after it had been read to the jury, objected to by the defendant, for the same reasons that were urged against the other depositions; but the court decided that the objection came too late, and charged the jury among other things, that no evidence of the character of a witness was admissible, legal or proper for the jury to consider, to impeach or sustain a witness, except evidence of the character of a witness for truth, and that all evidence of the character of a witness in any other particular than for truth, should be by the jury laid out of the case—to which charge no exception was taken.

The jury returned a verdict for the plaintiffs.

To the refusal of the court to charge as requested, in relation to the contradiction of Pine, and to the admission of the said depositions, the defendant excepted.

*W. H. Smith* and *D. Roberts* for defendant.

I. The defendant claims that having *disproved* the *time, place* and *circumstances* laid by Pine, as connected with the admissions of the defendant, he *disproved* the *admissions themselves.*

Observe, that as to the first admission, Pine fixes the *time* and *place positively*, without any words implying doubt or uncertainty. He asks no charitable construction from court or jury, that he may be mistaken as to time or place. The time *was* the Sunday preceeding the fire; the place *was* Mrs. Bresee's.

As to the second admission, the only uncertainty expressed by Pine, is as to which of the two Sundays named, was the true date of the admission.

Having disproved the *time, place* and *circumstances* laid by Pine, the court erred in instructing the jury that they might believe the admissions made at *some other time* and *place*, for legal belief can only be based upon evidence, and here was no evidence of other time or place, or opportunity even, when these or like admissions were or could have been made. At best, the conclusion against us could be only a conjecture or guess of the jury. But this the court could not license them to do. *Hollister* v. *Johnson*, 4 Wend. 639. *Manwell* v. *Briggs*, 17 Vt. 176.

"It is error to submit to the jury as a possible reconciliation of

contradictory evidence, a supposed fact, of which no evidence whatever has been offered." *Haines* v. *Stouffer*, 10 Barr 363. 9 U. S. Dig. 417 § 52.

Again, the first admission has a peculiar force, from the circumstance of time—that it was made *before the fire ;* and so far, the time is material. The charge of the court leaves the jury to infer that it is just as well, though that admission was made after the fire.

II. As to the depositions—

The true question is as to *general reputation* for truth. *Character*—" The peculiar qualities impressed by nature or habit on a person, which distinguish him from others." Webster's Dictionary. *Reputation*—" character by repute." Ib. When, therefore A. J. Palmer says of Pine, "I believe his character for truth and veracity is good," he is merely expressing his *belief* as to the qualities of the man; and when Reynolds says of Pine, " he stands on a par with other men for truth and veracity," he makes no reference to the estimation, in which Pine is held by the public, or to his character by repute ; he does not even use the word *character* or its equivalent; but merely affirms his own belief that Pine *is* as truthful as other men. *Again*, the words stricken out, qualify and limit to the period of their acquaintance in Williston, the words which remain, thus the sense of what remains is changed by what is taken away.

Murray says of Pine, "I consider him to be a young man of good standing, and on a par for truth and veracity."

But what did the public consider ? Did *they* consider *him on a par ?* and par with whom or what ?

*M. G. Everts* and *Edgerton & Allen* for plaintiffs.

I. The defendant was not entitled to the charge asked for relative to the evidence of Pine.

The request is virtually that the court pass upon the credibility of the witness. This has always been held to be the exclusive province of the jury. The court can pass only upon the competency of the evidence. Pine may have been mistaken as to time and place, and yet his testimony relative to the defendant's admissions be true. 1 Starkie on Ev. 578, 583. *State* v. *Roe*, 10 Vt. 110. The court were not requested to charge the jury to reject

the evidence of Pine, if they found that he had wilfully falsified.

II. The charge of the court, relative to the contradiction of Pine, was sufficiently favorable to the defendant to satisfy the rule of law as to him. The court left the whole question of the credibility, and weight of evidence to the jury. Starkie on Ev. and *State* v. *Roe*, before cited. —

III. The objection to the depositions which were admitted by the court, was that they were "*immaterial* &c." The depositions objected to, excluding that part of the deposition of Reynolds which was excluded by the court, are both *material* and *pertinent in substance*, and in the usual form of evidence to impeach or sustain the character of a witness for truth. *State* v. *Smith*, 7 Vt. 141. 2 Phil. on Ev. *note* 344, page 460.

IV. The deposition of Wakefield was not objected to till it had been read to the jury. The objection then came too late, and the only thing which could be done in regard to it was to give the proper instructions to the jury, which instructions were given.

The charge relative to this deposition is not excepted to, and the practice is fully sustained by the case of *Warden* v. *Estate of Warden*, 22 Vt. 563.

The opinion of the court was delivered by

REDFIELD, Ch. J. I. The objection to the testimony of Pine was certainly allowed to its most liberal extent by the court below. The issue attempted to be raised in regard to his testimony was altogether collateral to the main issue in the case, and the court might have rejected the testimony altogether, and it would not have been error. We may suppose, that such collateral issues might spring up, in regard to the testimony of every witness upon the stand, and thus a single issue branch out into an indefinite number of subordinate and collateral ones, and these again into as many more, upon each point, so that it would become literally impossible ever to finish the trial of a single case. This rule therefore, that one cannot be allowed to contradict a witness, upon a matter wholly collateral to the main issue, becomes of infinite importance, in the trial of cases before the jury. A judge may no doubt, in his discretion, allow a departure from the rule, but is not obliged to do so. This is sometimes done, in important criminal cases, depending upon circumstantial evidence and was very likely

suffered in the present case, on account of the peculiar character of the evidence in the case upon one or both sides. But the judge after admitting the evidence, certainly gave the defendant every reasonable advantage, which he could rightfully claim, by submitting it to the jury, whether upon the whole, they believed the main fact testified to by the witness. This point is expressly decided by this court in *Stevens* v. *Beach*, 12 Vt. 585.

II. The objection to the other depositions (except that of Wakefield, which came too late,) are certainly ingenious, but it seems to us, too refined, for practical application to the detail of jury trials. Depositions are often equivocal, as some of these are and which, if the doubt is solved one way, should be rejected. The better rule in such cases, and the most acceptable one, to all, in the long run is, to admit the testimony, and leave the interpretation to the jury, with proper instructions, as was done in the present case. It is perfectly proper to submit the interpretation of a doubtful expression in a deposition, to a jury, since it is but oral evidence which it is their province to weigh and to interpret. But a court may also put its own construction upon the evidence, and direct a verdict, as has been often held, but it is not obliged to do so, as it is in regard to written contracts.

But it seems to us, that these depositions are well enough. In those of both Palmers, and Conley, the testimony is, as to the character of the witness for truth. In George Palmer's, the expression is general character—character and general character are the same of course, if by character, we understand the common estimation, in which the man is held, by his acquaintance, for truth. And the books upon evidence so use the term. The word character no doubt has an objective and subjective import, which are quite distinct. As to the object, character is its quality. As to man, it is the quality of his mind, and his affections, his capacity and temperament. But as a subjective term, certainly in the minds of others, ones character is the aggregate, or the abstract, of other men's opinions of one. And in this sense, when a witness speaks of the character of another witness for truth, he draws not upon his memory alone, but his judgment also. It is the conclusion of the mind of the witness, in summing up the amount of all the reports he has heard of the man, and declaring his character for truth, as held in the minds of his neighbors and acquain-

tances, and in this sense character, general character, and general report or reputation are the same, as held in the books.

Murray and Reynolds say, he is a young man " of good standing," and " on a par with other men for truth and veracity." This may mean merely the opinion of the witness, as to the man's truth, gathered from personal knowledge and acquaintance, and if so, ought undoubtedly to be rejected. But, as we said, it is equivocal, and taken altogether, seems fairly to import the opinion of the witness testifying as to the standing of the other witness, in regard to truth. It can fairly signify nothing else, I think. And a man's standing for truth is his reputation, his character among his acquaintance and neighbors for truth, and in this sense the testimony was admissible, and the jury were told not to regard it unless they considered it bore this signification and import, in the depositions.

Judgment affirmed.