**(90 South. 574)**

**No. 24573.**

**STATE v. HARRIS et al.**

(May 2, 1921. On Rehearing, Oct. 31, 1921. Rehearing Denied Nov. 28, 1921.)

*(Syllabus by Editorial Staff.)*

**1. Threats** ⟾5—**Indictment held to charge attempt to extort money by threats to kill, from officials and not from corporation.**

An information in a prosecution under Act No. 110 of 1908, *held* to charge an attempt to extort money from certain officials of a corporation by threatening to kill them, and not to charge an attempt to extort money from the corporation.

**2. Criminal law** ⟾1472(7)—**Instruction too favorable to appellant not ground for reversal.**

An instruction more favorable to defendant than he was entitled to obtain does not furnish ground for reversal.

150 LOUISIANA REPORTS

**3. Criminal law ⬅419, 420(1)—Secondary evidence as to receipt of telegram held hearsay.**

In a prosecution for extortion under Act No. 110 of 1908, secondary evidence as to receipt by defendant of a telegram, consisting of proof by the agent of the telegraph company that defendant had received by telegraph a copy of the message in question, *held* inadmissible as hearsay.

On Rehearing.

**4. Witnesses ⬅393(1)—Evidence impeaching credibility of state's witness held improperly excluded.**

In a prosecution for attempted extortion under Act No. 110 of 1908, based upon a letter by defendant threatening to kill certain officials of a corporation if they did not make good an amount represented by checks taken by such officials from one of the defendants, evidence by a juror on a former trial of one of the defendants, as to statements made by such defendant on that trial, to impeach the credibility of such defendant as a state's witness, *held* improperly excluded.

Provosty, J., dissenting.

Appeal from Fifteenth Judicial District Court, Parish of Allen; Thomas F. Porter, Jr., Judge.

George Harris, Rosella McMillan, and others were convicted of extortion. A nolle prosequi was entered as to all other defendants except the one last named, and she appeals. Conviction and sentence set aside on rehearing, and case remanded.

Peyton R. Sandoz, of Opelousas, for appellant.

A. V. Coco, Atty. Gen., and Griffin T. Hawkins, Jr., Dist. Atty., and Mark C. Pickrel, Asst. Dist. Atty., both of Lake Charles (T. S. Walmsley, of New Orleans, of counsel), for the State.

O'NIELL, J. George Harris, Rosella McMillan, and three others, were prosecuted for attempting to extort money by means of a threatening letter, threatening to kill the quarter boss and the officials of the Peavy Burns Lumber Company. Harris was tried first and convicted. A nolle prosequi was entered as to all other defendants except Rosella McMillan. She was tried and convicted and appeals from the verdict and a sentence of imprisonment in the penitentiary.

Before pleading to the bill of information, appellant filed a demurrer or motion to quash the bill, averring that it did not charge the commission of a crime, or a violation of any statute. Her contention is that the statute, for the violation of which she was prosecuted, Act 110 of 1908 (page 166), making it a crime to attempt to extort money from any person by means of threatening letters, does not make it a crime to attempt to extort money from a corporation by means of threatening letters or otherwise. This contention is presented, not only in the bill of exception reserved to the overruling of the motion to quash, but also in bills of exception reserved to the overruling of a motion for a new trial, a motion in arrest of judgment, and in bills reserved to several other rulings made by the district court.

Act 110 of 1908, is an amendment and reenactment of section 1 of Act 63 of 1884, entitled:

"An act to provide for the punishment of the offense and crime of attempting to extort money or any property or valuable thing, through or by means of threats, threatening letters or communication, or by means of other unlawful acts or devices."

The statute declares:

"That if any person shall knowingly send or deliver, or cause to be sent or delivered, or shall cause to be received by another any letter, postal card, writing or printed matter, threatening to accuse him or her, or any member of his or her family or to cause him or her, or any member of his or her family, to be accused of any crime, offense or misdemeanor, * * * or shall threaten to kill, maim, wound, murder, or kidnap or subject him or her, or any member of his or her family, to bodily harm of any kind, with intent to extort money, goods, chattels or any promise or obligations for the payment of money or the transfer or delivery of any money or other valuable thing whatsoever, or any release, benefit, advantage, or immunity,

\* \* \* or any person or persons aiding, advising and abetting such person or persons in the matters and things above set forth, upon conviction, shall be imprisoned at hard labor for not less than one year nor more than twenty years, and shall be fined in a sum not exceeding two thousand dollars."

The charge in the bill of information was in the language of the statute, viz.:

"That George Harris, Rosella McMillan, \* \* \* did unlawfully, knowingly, willfully, maliciously and feloniously send and deliver, and did cause to be sent and delivered, to the following officers of the Peavy Burns Lumber Company, to wit, J. O. Cupples, W. H. Allen, and other officials whose names are unknown to the district attorney, a threat to kill the officials of the Peavy Burns Lumber Company, and the quarter boss, which said threat was contained in an anonymous letter as follows, to wit:" (Here is inserted the threatening anonymous letter, addressed to the Peavy Burns Lumber Company, demanding that $534 should be deposited at a certain place on a certain date, and threatening that, unless the money should be deposited at the time and place stated, the authors of the letter, styling themselves The Original Bunch of United States Ax Men, would kill the quarter boss and every official and property holder of the company.) "With intent to extort money to the amount of five hundred and thirty-four dollars from the officials of the Peavy Burns Lumber Company, as follows, to wit, J. O. Cupples, W. H. Allen, and other officials whose names are unknown to the district attorney; contrary to the form of the statute of the state of Louisiana, in such case made and provided," etc.

[1] The attorney for appellant argues that the bill of information charges an attempt to extort money from the Peavy Burns Lumber Company, not from any individual. The bill charges that the attempt was to extort money from certain officials of the corporation, by threatening to kill all of the officials of the corporation and the company's quarter boss. The designation of the persons threatened, as being the officials of the Peavy Burns Lumber Company, merely described the individuals who were threatened, and from whom the attempt was made to extort money; it did not mean that they were threatened in their official capacity, or that the attempt was to extort money from them in their official capacity. An attempt to kill an officer of a corporation is a threat to kill the individual, physically, not the officer in his official capacity. According to the language of the statute, it would make no difference whether the "intent to extort money" was an intent to extort the money belonging to the individuals or an intent to extort money under their control as officers of the Peavy Burns Lumber Company. The language of the statute is not confined to an intent to extort money from an individual. The statute makes it a crime to threaten to kill a person with intent to extort money, and that is exactly what the defendant in this case was accused of having done.

The fact that the threatening letter was addressed to the corporation, and not to the officers as such, is a matter of no importance. The accusation was that the defendant did send and deliver, and did cause to be sent and delivered, to the officials named, the anonymous letter addressed to the corporation and threatening to kill the officials. The statute makes it a crime to deliver to a person, or to cause to be delivered to him, a letter threatening to kill him unless a certain sum of money should be paid, even though the letter might be, on its face, addressed to some other person. There is therefore no merit in appellant's contention that the bill of information did not accuse her of a crime.

Appellant reserved a bill of exception to the refusal of the district judge to give the jury the special charge:

"That, in order to convict in this case, it must have been alleged in the information, and proved on the trial, that the defendant sought to extort money from J. O. Cupples and W. H. Allen as individuals, and not as officials of any corporation."

In his general charge, the judge had instructed the jury as follows, viz.:

"One cannot be convicted of attempting to extort money from a corporation, such as the Peavy Burns Lumber Company, for such would not be against the criminal laws of the state. Therefore, in order to convict in this case, it must appear to your satisfaction that the defendant sent or delivered, or caused to be sent or delivered, the threat to kill and murder, set forth in the bill of indictment, to J. O. Cupples and W. H. Allen, or either of them, with the intent to extort money from the said two men or either of them."

[2] The instruction was substantially what was asked for in the request for a special charge, and seems to have been a more favorable instruction than the defendant was entitled to.

[3] Several bills of exception were reserved to rulings excluding secondary evidence that a certain telegram had been received by the defendant on the date of the alleged crime. Defendant was unable to produce the original telegram which she said had been delivered to her, and there was no record of the telegram at the alleged receiving office. Defendant sought to prove by the agent in charge of the office that he had, several days after the date of the alleged crime, received by telegram from the alleged sending office a copy of the message in question. We agree with the district judge that such evidence would have been hearsay testimony. The ruling, however, excluding the testimony, was a matter of no importance, because there was no dispute that the telegram had been received on the date alleged; in fact, the district attorney had already offered proof of the receipt of the telegram on the date alleged.

The verdict and sentence appealed from are affirmed.

DAWKINS, J., takes no part.

### On Rehearing.

DAWKINS, J. In the application for rehearing and in brief and argument on rehearing, there have been brought to our attention certain bills of exception which were neither urged in the briefs nor in the oral argument on the first hearing. Hence we took it that they had been waived and did not consider them as we would otherwise have done.

We find no good cause to change our views with respect to the bills already considered.

The bills which we will now dispose of are those numbered from 13 to 16, inclusive.

### Bill No. 13.

This bill was retained to the sustaining of an objection by counsel for the state to a question propounded by the defense, as follows:

"Q. Do you recall the substance of the statement made by the witness George Harris at the former trial with reference to the checks which were taken from him (Harris) and torn up by the quarter boss of the Peavy Burns Lumber Company, and if so, please repeat the substance of the witness' (Harris') statement on that point, as you recall it."

The accused, whose appeal is now before the court, and who had been indicted jointly with George Harris for blackmail, had had a previous mistrial, in which Harris, as in the last trial, was the principal witness for the state. The witness, to whom the above question was propounded, was one of the jurors who sat in the former trial.

The letter which is the basis of the charge of blackmail was copied in full in the indictment, and the defendant now before the court was charged as principal with Harris, and others, with having written and sent it to the persons from whom the money was sought to be extorted. The letter in question reads, in part, as follows:

"Notice to you all and the quarter Boss of You Mill Premesy on Sunday week agoe you Quarter Boss taken from one of our sipers Two Check on Amount to $250.00, Two Hundred and fifty Dollars The other amount to $17.00. So you all had better see your Quarter Boss have him to make this money good By Wednesday night, etc.  *  *  *"

On the third day of the first trial, the state entered a nolle prosequi as to the defendant George Harris, and he was used as a state's witness against the two remaining defendants, Elijah Conway and Rosella McMillan. That jury brought in a verdict of acquittal for Conway, and reported that they were unable to agree as to Rosella McMillan, and a mistrial was entered. This was done on February 26th.

On March 3d, Rosella McMillan was again placed on trial, and on March 5th was found guilty as charged.

About a week prior to the sending and receipt of this letter of blackmail, George Harris had been arrested on the premises of the Peavy Burns Lumber Company and certain checks taken off of him by the quarter boss, and those were the checks referred to in the letter quoted from above and set out in full in the indictment of defendant.

On the first trial, Harris, as a witness for the state, swore that the checks had been drawn by him and the name of "Jim Kennison" forged thereto. On the second trial, Harris swore that the checks bore the signature of W. D. Haas.

The purpose of offering the testimony of the former juror Kinser was to impeach the credibility of the state's main witness, Harris, and the objection was that he could not be so impeached upon an immaterial matter.

If Harris had been on trial with Rosella McMillan, the circumstances of the taking of the checks, their nature, contents, identification, etc., would undoubtedly have been very material to establish Harris' connection with the blackmail letter, signed anonymously, and in which they were specifically referred to. Therefore, on his behalf, any witness placed on the stand by the state to prove the taking of the checks off of Harris could have been questioned fully about them including the amounts, bank drawn on, by whom signed, etc., as affecting the identity and connection of Harris therewith. And since the accused were all jointly charged as principals, the testimony would have been equally pertinent as to the others.

[4] Then, if Harris, with the other accused, had been on trial a second time, the same witness or witnesses appearing and testifying as to the main circumstance of taking the checks, but giving different banks upon which they were drawn, different signatures, etc., from those sworn to on the former trial, it would certainly have been pertinent and permissible, it seems to us, to have shown this variance in the testimony for the purpose of affecting their credibility, or at least the weight to be given their testimony. If this be true, then how much more important to the present defendant it was when the state dismissed the charge against the accused, whose connection with the blackmail appeared more conclusively to have been established by the circumstances, and used that same individual as its principal witness against the present defendant. In such circumstances, the appellant, we think, more so than in the case of any ordinary witness, was entitled to attack his veracity upon any point which might have the remotest bearing upon the case.

Again, on the second trial, the testimony of Harris as to how the checks were signed was first introduced by counsel for the state, who had doubtless considered it material in establishing Harris' connection with the letter; and the theory of the state's case being that the present accused had participated in its writing and mailing, it was still important to establish Harris' relation to the matter, as a link in the chain to be forged about defendant. No one can say what the effect upon the minds of the jury might have been, had the defense been able to prove these contradictory statements, the first of which was the admission that the witness had committed the crime of forgery, and in the second of which he swore that the checks

bore the genuine signature of another party. Certainly the admission that he had committed the crime of forgery was admissible to affect his credibility, and that was the thing the defense was seeking to break down. State v. Lewis, 44 La. Ann. 958, 11 South. 572; State v. Rodriguez, 115 La. 1004, 40 South. 438; Rece on Crim. Ev. vol. 3, p. 363; Wharton, Crim. Ev. c. 11, pp. 422, 484.

Since the case will have to be remanded on the point just disposed of, we think it unnecessary to go into detail as to the remaining bills, but deem it sufficient to say that we find no reversible error presented therein.

For the reasons assigned, the conviction and sentence are set aside and the case is remanded to be proceeded with according to law and the views expressed herein. The state's right to apply for a rehearing under section 4 of Rule 14 is reserved.

PROVOSTY, J. (dissenting). The charge against the accused is that she mailed a letter addressed to Peavy Burns Company in which "the Original Bunch of Axmen of the U. S." notified that company that its quarter boss had taken from "one of our sipers" two checks, of $250 and $17, and that unless this money was left at the boarding house of Rosella McMillan (the accused) by Wednesday night "we will kill every official and property holder of" your company.

A week before the mailing of this letter, one George Harris had been arrested by the quarter boss of said company, and the two checks referred to in said letter had been found on his person and had been destroyed.

The checks were forgeries—the handiwork of George Harris.

George Harris was jointly indicted with accused; but the prosecution as against him was nolle prossed in order that he might be used as a witness against accused. Another man, also jointly indicted, was acquitted.

On a first trial Harris testified, it seems, that the name on the forged checks—in other words, the drawer of them—was Jim Kennison; and on the second, or last trial, that it was W. D. Haas. Accused offered to show this discrepancy in the testimony for the purpose of impeaching the credibility of the witness, and objection was made and sustained on the ground that the former statement made by a witness being irrelevant to the issue could not be proved for the purpose of discrediting.

The majority opinion holds the statement in question to have been material to the issue, and finds that—

"The testimony of Harris as to how the checks were signed was first introduced by counsel for the state, who had doubtless considered it material in establishing Harris' connection with the letter."

And finds also that the statement made by Harris on the first trial "was an admission that the witness had committed the crime of forgery, and in the second trial he swore that the checks bore the genuine signature of another party."

I do not find the statement in question, as shown by the bill of exception, to have been material to the issue; nor that the testimony of Harris as to how the checks were signed was first introduced by counsel for the state, nor that there was any pretense on the part of Harris at any time that the checks were anything but forgeries.

The bill of exception reads as follows:

"Be it remembered, that on the trial of the above numbered and entitled cause, the witness C. E. Kinser, who sat as a juror at a former trial of this same defendant, was placed on the stand by the defendant for the purpose of impeaching the credibility of the witness George Harris, and showing a previous contradictory statement made by the said Harris from that which he made at the present trial, was asked: "Q. Do you recall the substance of the statement made by the witness George Harris at the former trial with reference to the checks which were taken from him (Harris) and torn up by the quarter boss of the Peavy Burns Lumber Company, and if so please repeat the

substance of the witness' (Harris') statement on that point as you recall it?

"Whereupon, the district attorney objected to the question on the ground that it is an impeaching question, and a witness cannot be impeached on a point that is irrelevant and immaterial and collateral to the issue.

"The court tells counsel for defendant that he may pursue this line of questioning provided he doesn't seek to contradict the witness George Harris as to the name written on the checks that were torn up by Mr. Allen, the quarter boss.

"Counsel for defendant states that the purpose of this testimony is to show that the statement of the witness George Harris, on the former trial, was that the checks torn up by Mr. Allen 'were signed by Jim Kennison,' and that at no time did he say the checks torn up by Mr. Allen were signed by W. D. Haas. And further that the real purpose of the question is to show that the witness George Harris made an entirely different statement at the present trial under oath, from that which he made at the other trial under oath.

"By the Court: To the counsel for defendant: You mean in regard to these checks? A. Yes, sir.

"The court is of the opinion that the witness cannot be contradicted by another witness on a point not material to the issues of the trial for the purpose of affecting his credibility, and for this reason sustains the objection.

"Whereupon counsel for defendant excepts to the ruling of the court and reserves this bill of exception which is duly granted in open court."

### Bill No. 13.

"When George Harris was arrested, he being charged, jointly with defendant Rosella McMillan, the deputy making the arrest upon searching Harris found that he had two checks in his pocket which George Harris in a former trial testified were checks that he himself had forged and to which checks he testified he had affixed the signature of Jim Kennison.

"Upon the second trial of this case, George Harris testified that the checks in question bore the signature of W. D. Haas.

"All of the testimony in regard to the forged checks which Harris had on him when he was arrested was irrelevant and immaterial and would have been ruled out had the defendant objected; however, since this testimony had absolutely no bearing on the issue involved in this case, and since it is well settled that testimony of a witness on an immaterial point cannot be contradicted, evidence as to what this witness

150 LA.—8

said on the former trial about those checks was not admitted."

The issue was as to whether accused had sent this blackmail letter. With that issue the fact of whether the checks referred to in the letter bore the name of Jim Kennison or W. D. Haas had nothing whatever to do.

The trial judge says that the checks themselves had no relevancy. The bill of exception does not show that they had any, and most certainly the bill does not show that the form of the checks, as to whether showing one name or another as drawer, was of any relevancy whatsoever. It is not pretended that there was anything in the checks themselves, or in the fact of their having been found on the person of Harris, to connect accused with them; or to show in any way, shape, or form, by inference or otherwise, that accused had sent the blackmail letter. Perhaps it was not entirely out of place for the state to show that the checks referred to in the letter really existed, and were forgeries; but to go into details of the form of the checks, whether on blue or white paper, on a printed blank or not, on a large or a small piece of paper, bearing the name of Kennison or Haas or John, Jack, or Joseph, or any other name, as drawer, or into any other detail, was, to my mind, as immaterial as almost any imaginable thing could well be.

With all due deference to my colleagues, I find neither in the bill of exception nor even in the briefs anything tending to show "the testimony of Harris as to how the checks were signed was first introduced by counsel for the state." The bill only shows that the alleged contradictory statement was made "on the trial." There is not a word as to its not having been made on the cross-examination. If its not having been made on the cross-examination was essential for showing that the trial judge erred in his ruling, that fact should have been made to appear positively in the bill. This court

cannot assume the existence of an essential fact, and overrule the trial judge upon this assumption. The rule is that the bill must show everything necessary to make the error complained of appear.

However, to my mind, the fact that .this irrelevant statement had been made on the direct examination, instead of having been brought out on the cross-examination, would make no difference in the case even if appearing in the bill. I do not agree with the statement contained in State v. Swindall, 129 La. 771, 56 South. 702, that—

"The rule which exempts a witness from contradiction with regard to collateral facts is limited to facts elicited on cross-examination."

In making that statement the court appears to have founded itself upon Wharton, Cr. Ev. (9th Ed.) par. 484. I have not that book at hand for ascertaining upon what decisions its text is founded, or by what reasoning sustained. But I am entirely satisfied that the weight of authority is the other way, and certainly the better considered cases are.

In Lambert v. Hamlin, 73 N. H. 138, 59 Atl. 941, 6 Ann. Cas. 713, the court says:

"In the cases adopting the view contended for by the plaintiff, * * * it seems to be considered that the main reason for the rule which prevents a cross-examination upon immaterial matters, for the * * * purpose of contradicting a witness, is that he cannot be presumed to come prepared to defend himself on such collateral questions; and as this reason fails when the testimony is voluntarily given, the rule itself does not in that case apply. But as said in Blakey v. Blakey, 33 Ala. 611, 620: 'The reason referred to is doubtless one of those on which the rule is founded, but it is not the only, or even the chief one. The principal reasons for the rule are, undoubtedly, that but for its enforcement the issues in a cause would be multiplied indefinitely, the real merits of the controversy would be lost sight of in the mass of testimony to immaterial points, the minds of jurors would thus be perplexed and confused, and their attention wearied and distracted, the costs of the litigation would be enormously increased, and judicial investigations would become almost interminable.'

Similar reasons are assigned for the rule in Scavy v. Dearborn, 19 N. H. 351. See, also, Attorney General v. Hitchcock, 1 Exch. 91, 104; Powers v. Leach, 26 Vt. 270, 277. According to the weight of authority, the reasons above assigned apply equally whether the evidence on such collateral. matters is brought out on the examination in chief or upon cross-examination, and whether the witness gives it voluntarily or in response to questions calling for it. Blakey v. Blakey, supra; Commonwealth v. Buzzell. 16 Pick. [Mass.] 153, 158; 1 Green. Ev. s. 461e; 2 Wigmore, Ev. § 1007."

At the place here referred to Mr. Wigmore says:

"Occasionally, before the theory had been completely worked out by the courts, the argument of unfair surprise was treated as the only objection, and it was thought that where the assertion desired to be contradicted had been made on the direct examination—i. e., had been 'volunteered,' as the phrase went—the witness had himself only to blame if he was not prepared to support every statement thus volunteered: in short, that all assertions made on the direct examination could be contradicted and shown erroneous, and that the prohibition was equally inapplicable to assertions volunteered on cross-examination; upon which, it was thought, there could not be any unfair surprise. This form of the rule, which still crops up occasionally, is based on an ignoring of the other co-operating reason for the rule, i. e., confusion of issue; and even if it could be conceded (as it cannot) that this form sufficiently obviates the reason of unfair surprise, the other reason would still remain, and would be equally fatal, even when the assertion on the collateral matter was made on the direct examination."

The Supreme Court of Alabama, overruling former cases, has adopted the view here expressed by Mr. Wigmore. Blakey v. Blakey, 33 Ala. 619.

For my part I can conceive that. by bringing out some fact · pointedly as if having some importance a situation might be created where the fact so brought out might appear to be relevant and important, though not so in reality; and I imagine that in such a case the contradicting or impeaching evidence might properly be admitted. But no case of that kind is presented here. For

all that appears, as already stated, the statement in question in this case may not have been made on the examination in chief, but may have been brought out on the cross-examination; and, at all events, even if on the examination in chief, was not brought out as important matter, but would appear to have come in purely incidentally.

There can be no doubt that the credibility of a witness may be greatly affected by testimony showing that he has made contradictory statements, or that statements made by him are false; but if such statements bear upon matters irrelevant to the issue, they cannot be contradicted. The rule in that regard is everywhere recognized when the statements have been brought out on cross-examination; and I cannot see what difference it can make that they have cropped out· of the examination in chief, instead of having been brought out on cross-examination.

Perhaps if the accused is allowed to shift the trial from herself to George Harris she may succeed in securing ·an acquittal; but for the time being the trial is of her, not of George Harris.

To my mind the bill is very far from showing that there was any pretense on the second trial, either on the part of George Harris or of any one else, that the checks found on the person of Harris were genuine documents. To my mind it is patent from the bill as a whole that the fact of the checks having· been mere worthless forged documents was uncontested upon either trial. The word "genuine" is not in the bill, and, as I read the bill, the word "signature" is used in it to express nothing more than the meaning conveyed by the word "name." It will be noted that the part of the bill prepared by counsel for accused uses the word "name." True, in that part of the bill it is said that "the statement of the witness George Harris on the former trial was that the checks torn by Mr. Allen were signed by

Jim Kennison," from which an inference might be drawn that Harris had on the former trial testified that the name of Jim Kennison on the check was that person's genuine signature; but that statement in the bill must be read in connection with the statement of the judge that "George Harris on the former trial testified" that the checks "were checks which he himself had forged and to which checks, he testified, he had affixed the signature of Jim Kennison." However, I do not see that the matter of the name on these checks would be rendered any more material to the issue by the fact of Harris having testified on the second trial that the name was W. D. Haas and that the·signature was genuine. The drawer's name on this forged check had absolutely nothing to do with the issue of whether accused sent this blackmail letter or not. And if there was any relevancy the bill should have shown it in some positive manner, so that this court might know to some certainty whether the trial judge had erred or not in his ruling.

It may not be out of place to mention that the grounds upon which the majority opinion is based were not even alluded to in the brief filed by accused on the first hearing of · the case in this court.

I therefore respectfully dissent.